UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| LAURIE JO BUGBEE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   File No. 1:15-cv-240-jgm |
| | : |
| | : |
| NANCY A. BERRYHILL, | : |
| Acting Commissioner of Social Security, | : |
| | : |
| Defendant. | : |
| | : |

MEMORANDUM AND ORDER
(Docs. 9, 12)

I.    Introduction

      Plaintiff Laurie Jo Bugbee (Bugbee) brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and reversal of the Commissioner of Social Security's (Commissioner) denial of her application for disability insurance benefits and supplemental security income. Pending before the Court are Bugbee's motion seeking an order reversing the Commissioner's decision (Doc. 9), and the Commissioner's motion seeking an order affirming her decision (Doc. 12). For the reasons set forth below, Bugbee's motion to reverse is granted in part and denied in part, the Commissioner's motion to affirm is denied, and the matter is remanded for further proceedings and a new decision.

II.    Background

    A.    Procedural

      On March 26, 2012, Bugbee filed applications for disability insurance benefits and supplemental security income, alleging she became disabled as of December 10, 2010. (A.R. 225-26.) On June 6, 2012, her applications were denied, id. at 107-10, and, on August 1, 2012, were

denied again on reconsideration, id. at 115-21. Bugbee filed a timely request for an administrative hearing, id. at 7-8, which was held by Administrative Law Judge ("ALJ") Thomas Merrill on May 19, 2014, id. at 32-71. She appeared with an attorney at the hearing and testified. Id. On July 21, 2014, the ALJ issued a decision concluding Bugbee was not disabled from the alleged disability onset date. Id. at 12-25. The Appeals Council denied her timely request for review on September 11, 2015, and the ALJ's decision became the final decision of the Commissioner. Id. at 1-6.

On November 10, 2015, Bugbee timely filed this action. (Doc. 1.) She raises three challenges to the ALJ's decision: (1) the ALJ erred by omitting neuropathy and fibromyalgia as impairments when considering her disability and in failing to consider those impairments in combination with other impairments; (2) the ALJ erred by not affording her treating physician's opinion controlling weight; and (3) the ALJ erred in his credibility assessment. (Doc. 9.)

B.   Medical History

Bugbee was born on November 20, 1963. (A.R. 225.) She has a high school education and past relevant work as a deli worker at a small general store. Id. at 37. She was born with congenital deformity in her feet and hands, and underwent multiple childhood surgeries. Id. at 42-43. Constriction ring syndrome led to partial amputations of several digits. Id. at 504. In the early 2000s, she underwent right carpal tunnel release surgery and, though she had bilateral carpal tunnel, she did not have surgery on the left. Id.

In June 2009, she was injured in a motor vehicle accident. Id. at 480. She attended physical therapy from July 2009 until April 2010. Id. at 474-80. In May 2010, she saw orthopedist Dr. Michael Barnum, who assessed radiculitis with mechanical neck pain in the cervical spine and noted an MRI revealed a C6-7 herniated nucleus pulposus. Id. at 780-81. After attempting a conservative course of treatment, including injection therapy, Bugbee was additionally diagnosed with C5-6

herniated nucleus pulposis and degenerative disc disease, and underwent spine surgery in March 2011. Id. at 777-79, 782-87. She continued with physical therapy until December 2011, and was performing "all activities but with pain." Id. at 468-73. At a March 2012 follow-up, Dr. Barnum assessed a solid fusion "after a delayed union." Id. at 771.

Also in March 2012, Bugbee saw hand surgeon Dr. James Mogan for bilateral hand numbness. (A.R. 504.) Dr. Mogan assessed suspected circulatory issues and recommended an EMG. Id. In April 2012, neurologist Dr. Andres Roomet performed an electrophysiologic evaluation and assessed "very mild but definite" left carpal tunnel syndrome. Id. at 790-91. In October, Dr. Roomet noted continued numbness of her hands after the spinal fusion in March 2011, and progressive numbness in her feet beginning in 2010. He performed nerve conduction studies on her lower extremities, and assessed suspected polyneuropathy which, in his opinion, "would explain the numb feet and possibly the numb hands as well as subjective complaints of balance difficulties." Id. at 792-94.

In June 2012, Bugbee saw rheumatologist Dr. James Trice for joint pain. (A.R. 723.) He noted she had been plagued with diffuse pain involving her hands and arms for the last 18 months and diagnosed diffuse musculoskeletal pain of unclear etiology. Id. at 723, 727. At a follow-up in March 2013, Dr. Trice's primary diagnosis was fibromyalgia. Id. at 1042. While he noted she had no pain in her wrists, elbows, left shoulder, hips, knees and ankles with passive motion, he stated she "is tender on palpation over almost all of the classic anatomic sites associated with fibromyalgia." Id. at 1053.

In April 2013, Bugbee saw orthopedist Dr. John Lawlis for shoulder pain. (A.R. 864.) He diagnosed impingement syndrome shoulder and wanted her to have an MRI and to see a shoulder surgeon. Id. at 867. The MRI revealed small tears of the supraspinatus tendon, moderate

supraspinatus and mild subscapularis tendinopathy, and possible slight subluxation of biceps tendon[1] and small SLAP tear.  Id. at 804.  Bugbee elected to proceed with an independent exercise program and right AC joint injection.  Id. at 875.  Upon follow-up in June, Dr. Lawlis diagnosed moderate right osteoarthrosis AC joint and, though the injection was initially helpful, she decided to proceed with surgical intervention.  Id. at 878-80.  In July, she canceled the scheduled August surgery noting the injection was helpful though her pain was not eradicated; Dr. Lawlis was concerned about a surgical approach exacerbating her fibromyalgia.  Id. at 884.  He diagnosed right impingement syndrome shoulder and right osteoarthrosis AC joint and ordered physical therapy.  Id. at 886.  Bugbee thereafter attended physical therapy.  Id. 921-25.

In October 2013, Bugbee saw vascular surgeon Dr. Georg Steinthorsson for finger and hand coolness, discoloration and circulatory problems in her hands.  (A.R. 1104-05.)  While many tests were negative, Dr. Steinthorsson assessed significant shoulder and neck pain, noted she may have Raynaud's phenomenon with her fibromyalgia, and offered noninvasive vascular studies.  Id.

In December 2013, Bugbee saw neurologist Dr. Waqar Waheed for an electrodiagnostic consultation.  (A.R. 795-96.)  The study showed evidence of a mild to moderate degree of neuropathy across the left wrist such as with carpal tunnel syndrome and a minimal degree of left ulnar neuropathy across the elbow.  Dr. Waheed noted vascular thoracic outlet syndrome could not be excluded by nerve conduction studies and arterial dopplers of upper extremities could be obtained for further evaluation.  Id.

In January 2014, Bugbee returned to Dr. Trice for joint pain.  (A.R. 1147.)  He noted her primary diagnosis was fibromyalgia and while there was no swelling or tenderness in the small joints of the hands and no pain in wrists, elbows, shoulders, hips, knees and ankles with passive motion,

---

[1] Dr. Trice disagreed with the radiologist as he thought the biceps looked intact.  (A.R. 874.)

4

the "tender point exam was positive at all of the classic anatomic sites associated with fibromyalgia." Id. at 1147, 1158. Additionally, Adson's maneuver caused her hands to get numb and reduced the pulse amplitude of her radial pulses. Id. at 1158.

A late January MRI revealed mild and moderate lower lumbar facet arthritis; "mild+" disc degeneration at L4-5 and slight disc degeneration at L3-4; small right L4-5 intraforaminal disc herniation; severe foraminal stenoses at right L4-5 and moderately severe at bilateral L5-S1 and left L4-5; and, mild central canal stenoses at L3-4 and slight at L4-5. Id. at 1175-76.

At an April follow-up with Dr. Trice's office, Bugbee's gait was normal without an assistive device, she moved on and off the exam table independently, and her muscle strength was not formally assessed but her extremities moved against gravity. (A.R. 1165.) Her diagnosis was fibromyalgia as she "[c]ontinues with ongoing diffuse myalgias and several active tender points." Id. at 1167. Her dose of Lyrica would be slowly increased to 275mg daily and she was referred back to physical therapy to establish an appropriate exercise program. Id. The same day, Bugbee had a reassessment for possible vascular thoracic outlet syndrome. The vascular report by Dr. Steinthorsson revealed no evidence of hemodynamically significant disease bilaterally. Id. at 1186.

Throughout this time, Bugbee saw her primary care physician Dr. Audrey von Lepel. (A.R. 509-81, 807-57, 895-911, 1170-71, 1188-99.) Her medications have included albuterol, alprazolam, amitriptyline, butalbital, cyclobenzaprine, cymbalta, gabapentin, hydromorphone, lunesta, lyrica, januvia, meperidine, savella, simvastatin, singulair, and tramadol. Id. In 2010-2011, she complained of muscle pain and weakness, tenderness, impaired range of motion, shoulder pain, and upper extremity paresthesias and weakness. Id. at 529, 537. In March 2012, she requested a referral to a hand specialist because of movement, control, and circulation issues including swelling,

5

discoloration, weak grasp, difficulty writing and opening jars, numbness, and joint deformity.  Id. at 567.  The April record notes Bugbee had chronic pain related to her congenital foot and hand deformity that had been treated with opioid analgesics, muscle relaxants, and physical therapy in the past, functional limitations in general activity, mood, walking ability, work, housework, activities of daily living, sleep and enjoyment of life, and assessed peripheral neuropathy.  Id. at 572.  The May record also noted Bugbee had been unable to use her hands for the past year.  Id. at 580.  In July, Bugbee noted worsened upper extremity paresthesis, pain, weakness, neck stiffness and pain, and lower extremity weakness.  Dr. von Lepel assessed, inter alia, cervical neuritis, shoulder joint pain, and peripheral neuropathy.  Id. at 807, 810.  In September, the symptoms remained the same and assessment included fibromyalgia.  Id. at 817, 820.

A January 2013 record notes Bugbee was following up on peripheral neuropathy that had gradually onset two years prior and caused pain, numbness, weakness and temperature sensitivity in her fingers, hands , toes, and feet which was being treated with non-opioid and opioid medications.  Id. at 836.  In June, she had a routine follow-up for her fibromyalgia including refilling her hydromorphone prescription.  In August, her symptoms had worsened, she had loss of sensation in her hands and feet aggravated by picking up small objects and repetitive motions, and was assessed with pain in the hands, diabetes, fibromyalgia, numbness, and peripheral neuropathy.  Id. at 909, 911.

In January 2014, she presented with pain and noted her symptoms had not changed and were aggravated by activity such as lifting and raising her arms over her head.  Id. at 1188.  In March, her diagnoses included brachial neurities or radiculitis, myalgia and myositis, and neuropathy peripheral hereditary.  Id. at 1170.  Because her symptoms were not well-controlled, she was directed

to wean off savella and then begin cymbalta for her fibromyalgia and chronic pain in addition to the hydromorphone, which she had done by May. Id. at 1194, 1198.

    C.         Medical Opinions

Dr. von Lepel wrote a May 30, 2012 letter noting Bugbee was born with a congenital problem and is missing digits on both hands and feet, has a very difficult time handling objects, holding a phone, and is developing neuropathy in her fingers and toes, which causes a great deal of pain and she cannot walk for long periods of time. (A.R. 613.) In a June 2012, medical source statement of ability to do work-related activities, Dr. von Lepel opined Bugbee could lift and carry up to ten pounds occasionally; sit for two hours and stand or walk for 30 minutes each with alternation; reach, finger, feel, and push/pull occasionally with her right hand; operate foot controls occasionally; climb stairs/ramps, kneel, crouch and crawl occasionally; and move mechanical parts, operate a motor vehicle, and tolerate humidity and wetness occasionally. Id. at 618-22. She did not feel Bugbee was able to use her hands to do manual labor on a full-time basis because of her neuropathy and believed Bugbee's medication, such as gabapentin that causes fatigue, would affect her ability to perform job related activities. Id. at 617.

On June 6, 2012, state agency consultant Dr. Ann Fingar opined Bugbee had medically determinable impairments of non-severe amputations and severe disorders of the back and carpal tunnel syndrome. As of June 2012, she stated Bugbee could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk and sit for six hours; unlimited push/pull with hands and feet; frequently climb stairs/ramps and crouch; occasionally crawl; unlimited balancing, stoop, and kneel; avoid concentrated exposure to extreme cold and hazards; avoid even moderate exposure to vibration. (A.R. 78-80.) Dr. Fingar noted limited handling and fingering on

the left as a result of carpal tunnel syndrome but stated there was no limitation in Bugbee's feeling (skin receptors). Id.

On July 31, 2012, state agency consultant Dr. Carl Runge opined Bugbee had the same medically determinable impairments and exertional, manipulative, and environmental limitations as Dr. Fingar, except for limited handling and fingering on both the left and right because of left carpal tunnel and multiple constricted digits on both hands. (A.R. 99-102.)

In a May 2014 statement, Dr. von Lepel opined Bugbee could lift up to twenty and carry up to ten pounds occasionally; sit for ten, stand for five, and walk for 10 minutes each with alternation including lying down; reach but not handle, finger, feel, or push/pull; operate foot controls occasionally; balance, stoop, and kneel occasionally; and operate a motor vehicle and tolerate extreme heat occasionally. Id. at 1224-28. With regard to mental capacity, Dr. von Lepel opined Bugbee had mild impairment in understanding and remembering simple instructions and carrying out simple instructions and moderate impairment in ability to make judgments on simple work-related decisions, understanding and remembering complex instructions, carrying out complex instructions, and ability to make judgments on complex work-related decisions. Id. at 1230. She also wrote a letter noting Bugbee's fibromyalgia was "quite severe" and, as a result of neuropathy, she was "having a really difficult time picking things up, holding them and doing any kind of fine finger work." Id. at 1233. She further opined, "[w]ith the amount of mediation she's taking right now I'm not sure that she could work." Id.

D.     Hearing Testimony

At the hearing, a vocational expert testified that someone with limitations consistent with Bugbee's limitations as determined in the RFC would be unable to perform Bugbee's past relevant

work but could perform the jobs of cashier, ticket seller, and usher--jobs that existed in significant in numbers nationally and regionally.  (A.R. 60-68.)

III.	Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability claims. Butts v. Barnhart, 388 F.3d 377, 380-81 (2d Cir. 2004). At the first step, the ALJ determines whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not, the ALJ determines whether the claimant has a "severe impairment." Id. §§ 404.1520(c), 416.920(c). If the ALJ finds the claimant has a severe impairment, the third step requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. §§ 404.1520(d), 416.920(d). A claimant is presumptively disabled if the impairment meets or equals a listed impairment. Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the

claimant can do "any other work." Id. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, Butts, 388 F.2d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In reviewing the Commissioner's disability decision, the court limits its inquiry to a "plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such a decision. 42 U.S.C. § 405(g). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Poupore, 566 F.3d at 305 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Commissioner, as the trier of fact, resolves evidentiary conflicts and assesses credibility. See Richardson, 402 U.S. at 399. Under this "very deferential standard of review," once an ALJ has found facts, a court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." Brault v. Commissioner, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and citation omitted); 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").

IV.   Discussion

Bugbee asserts the ALJ erred by omitting neuropathy and fibromyalgia as impairments when considering her disability and in failing to consider those impairments in combination with other impairments, by not affording her treating physician's opinion controlling weight, and in his

assessment of her credibility. (Doc. 9.) The Commissioner contends that substantial evidence supports the ALJ's determinations and credibility assessment. (Doc. 12.)

The ALJ found Bugbee met the insured status requirements through December 31, 2015, had not engaged in substantial gainful activity since December 10, 2010, and had severe impairments of degenerative disc disease of the cervical spine and left carpal tunnel syndrome. (A.R. 14-15.) He noted the existence of other diagnoses in the record, providing the example of shoulder pain, but stated a diagnosis "does not indicate the existence of severity" and there was no provider or other opinion regarding severity. Id. at 15. He stated he considered Bugbee's noted medically determinable non-severe impairments in determining her RFC. The ALJ determined Bugbee retained the residual functional capacity to perform light work except:

> she can lift and/or carry twenty pounds occasionally and ten pounds frequently, and stand and/or walk for six hours total in an eight-hour workday, and sit for six hours total in an eight-hour workday. [Bugbee] has unlimited use of her hands and feet for operation of controls and for pushing and pulling. [She] can frequently climb ramps and stairs, frequently crawl, and never climb ladders, ropes or scaffolds. [She] can perform unlimited balancing, stooping, and kneeling, and is limited to occasional handling and fingering with her left upper extremity. [She] must also avoid concentration [sic] exposure to extreme cold and hazards, and moderate exposure to vibrations.

Id. at 16. While the ALJ determined Bugbee was unable to perform her past relevant work, considering her age, education, work experience, and RFC, he found she is capable of making a successful adjustment to other jobs existing in significant numbers in the national economy. Id. at 23-25. Accordingly, he found she was not disabled under the Social Security Act from December 10, 2010 through July 21, 2014, the date of his decision. Id. at 25.

An ALJ has an obligation to develop the administrative record and that duty remains even when the claimant is represented. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation

to develop the administrative record."). Medical records should include statements about what a plaintiff can still do despite impairments and the Social Security Administration "will request a medical source statement about what you can still do." 20 C.F.R. § 404.1513(b). The regulations explain an ALJ will consider RFC assessments made by State agency consultants. Id. § 404.1513(c).

Here, the ALJ gave the state agency consultants' opinions "substantial" weight[2], though they never saw, evaluated, or treated Bugbee[3], because they were "consistent with the medical evidence as a whole," and essentially adopted their findings in the RFC determination. (A.R. 21.) Because, however, Drs. Fingar and Runge's opinions were rendered in the summer of 2012, they could not have considered all the relevant medical information--which included records through May 2014--particularly Dr. Trice's March 2013 diagnosis of fibromyalgia. See Tarsia v. Astrue, 418 F. App'x 16, 18 (2d Cir. 2011) (holding where it was unclear whether an agency consultant reviewed all relevant medical information, the consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician). While the ALJ himself did review the medical records, he conspicuously omitted any mention of Bugbee's neuropathy and fibromyalgia diagnoses, including the positive tender point exams of "the classic anatomic sites associated with fibromyalgia," and Dr. von Lepel's opinion that Bugbee's fibromyalgia was "severe." Compare A.R. 20-22 with A.R 1053, 1158, 1233. Accordingly, substantial evidence does not support the ALJ's findings that the "whole" of the medical evidence is consistent with the state agency consultants' opinions.

---

[2] The ALJ did discount Dr. Runge's opinion regarding Bugbee's right upper extremity limitation finding it was not consistent with her more recent examinations. (A.R. 21.)

[3] See Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.").

Remand is necessary to afford Dr. Fingar, Dr. Runge, or another state agency consultant, an opportunity to review the full record, including Dr. Trice's diagnosis of fibromyalgia, prior to preparing a new report that includes a physical RFC assessment. The ALJ should also consider Social Security Ruling 12-2p, which was issued on July 25, 2012, for guidance regarding evaluating fibromyalgia when determining disability, and Social Security Ruling 96-8p, for guidance regarding including limitations or restrictions imposed by side effects of medication.

Despite Dr. von Lepel's status as Bugbee's treating physician, the ALJ afforded "limited weight" to her opinions. (A.R. 22.) The ALJ explained her opinions were "without support and contrary to the objective medical evidence;" she "relied quite heavily on the subjective report of symptoms . . . and limitations provided by" Bugbee; and her reports were not generally accompanied by physical examinations. Id. The records reveal Dr. von Lepel performed physical examinations and also made multiple referrals to specialists, who reported their findings back to her as the primary care physician, throughout the treating relationship. See, e.g., id. at 504-06, 769-71, 780-81, 792-96, 1104-05. Of particular concern is the ALJ's statement that a treating source's medical opinion may not be given controlling weight if it is inconsistent with other substantial evidence in the record "as is the case when there are other opinions in the file." Id. at 21. As discussed above, those other opinions were rendered without the benefit of years of Bugbee's medical records. On remand, the ALJ should reevaluate the weight to give Dr. Von Lepel's opinions under the treating physician rule, particularly in light of the long treatment relationship, regularity of examination, and additional medical records added after the state agency consultants' opinions were rendered.

In light of the Court's determination, the Court declines to consider Bugbee's claim the ALJ erred in his credibility determination. The Court notes an ALJ must evaluate the credibility of a claimant and arrive at an independent judgment, in light of medical findings and other evidence,

regarding the true extent of symptoms. Lugo v. Chater, 932 F. Supp. 497, 503 (S.D.N.Y. 1996) (citation omitted). Here, the ALJ found Bugbee's "symptom complaints not credible to the extent alleged." (A.R. 18.) Because the Court has determined the ALJ erred in giving substantial weight to the state agency consultants' opinions in determining the RFC, it is for the ALJ on remand to determine whether her statements are consistent with a properly supported RFC.

V.     Conclusion

The ALJ committed legal error because he relied upon medical opinions that did not consider the whole medical record. Accordingly, Bugbee's motion for an order reversing the decision of the Commissioner (Doc. 9) is GRANTED in part. The case is remanded for further development of the record. The motion is DENIED to the extent it requests an order remanding the case for a calculation of benefits. The Commissioner's motion seeking an order affirming her decision (Doc. 12) is DENIED. The matter is remanded for further proceedings and a new decision in accordance with this ruling.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 6th day of April, 2017.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge